## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOLLY WINSTON, individually and on behalf of all other persons similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **<u>JURY TRIAL DEMANDED</u>** |
| PEACOCK TV LLC., | |
| Defendant. | |

Plaintiff Holly Winston ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Peacock TV LLC., ("Peacock" or "Defendant").  Plaintiff makes the following allegations pursuant to the investigation of her counsel and upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## <u>INTRODUCTION</u>

1.      This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme with respect to its subscription plans for its Peacock TV media service that are available exclusively to consumers who enroll in Defendant's auto-renewal membership programs (collectively, the "Peacock Subscriptions," enumerated below) through its website at https://www.peacocktv.com/ (the "Peacock Website") and/or its mobile application(s) and/or set-top device(s) (the "Peacock Apps") (collectively with the Peacock Website, the "Peacock Platform").  Peacock is an American video streaming service owned and operated by Peacock TV, LLC, a subsidiary of NBCUniversal Media Group.[1] Defendant is one

---

[1] https://www.nbcuniversal.com/brands

of the leading industry streaming platforms[2] that offers a variety of content, including, movies, TV shows, news, sports, and pop culture on Peacock TV, as well as original shows and exclusive live events. Peacock TV currently has two subscription tiers: a premium version with ads for $5.99 per month or $59.99 per year, and a plus version for $119.99 per year, with no ads, offline downloads, and a local NBC channel LIVE, 24/7.[3] Relevant to Plaintiff's allegations, when consumers sign up for the Peacock Subscriptions, Defendant actually enrolls consumers in a program that automatically renews the Peacock Subscriptions from month-to-month or year-to-year and results in monthly or annual charges to the consumer's credit card, debit card, or third-party payment account ("Payment Method"). In doing so, Defendant fails to provide the requisite disclosures and authorizations required to be made to California consumers under California's Automatic Renewal Law ("ARL"), Cal. Bus. Prof. Code §§ 17600, *et seq.*

2.      Through the Peacock Platform, Defendant markets, advertises, and sells paid memberships to the Peacock Subscriptions, which include, without limitation, the following automatic renewal programs: Premium[4]; and Plus.[5] These subscription offerings are collectively referred to herein as the "Peacock Subscriptions."

3.      Consumers can sign up for Defendant's Peacock Subscriptions through the Peacock Platform.[6] To do so, consumers provide Defendant with their billing information, and

---

[2] Peacock TV is accessible on a wide range of platforms, including major web browsers, nearly all mobile and tablet devices, as well as Amazon, Android TV, Apple TV, Chromecast, Google TV, Hisense VIDAA, LG Smart TV, PlayStation, Roku, Samsung Smart TV, VIZIO, Xbox, certain cable provider set-top boxes like Xfinity, and Meta VR devices. Full list of compatible operating systems and devices can be accessed at https://www.peacocktv.com/help/article/what-devices-and-platforms-are-supported-by-peacock

[3] https://www.peacocktv.com/#ib-section-section-8

[4] Premium, priced at $5.99 per month or $59.99 per year, provides a similar content library to Premium Plus, offering over 80,000 hours of TV, movies, and sports content. The key difference is the presence of advertisements during streaming for Premium subscribers.

[5] Plus, priced at $11.99 per month or $119.99 per year, offers an ad-free streaming experience, ensuring subscribers are not interrupted by commercials. However, a limited amount of content still contains ads due to streaming rights, primarily affecting Peacock channels, events, and select shows and movies. Plus users also get the convenience of downloading and watching certain titles offline, in addition to gaining access to their local NBC channel for live viewing around the clock.

[6] *Id.*

Defendant then automatically charges its customers' Payment Method as payments are due on a monthly or yearly basis.   Defendant is then able to unilaterally charge its customers renewal fees without their consent, as it is in possession of its customers' Payment Information.  Thus, Defendant has made the deliberate decision to charge Plaintiff and other similarly situated customers on a recurring basis, relying on consumer confusion and inertia to retain customers, combat consumer churn, and bolster its revenues.

4.     Pursuant to the ARL, online retailers who offer automatically renewing subscriptions to California consumers must: (i) provide the complete automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to completion of the enrollment process, *see* Cal. Bus. Prof. Code § 17602(a)(1); (ii) obtain consumers' affirmative consent prior to charging their Payment Methods in connection with the subscriptions, *see id*. § 17602(a)(2); and (iii) provide an acknowledgment that includes the automatic renewal offer terms and identifies a cost-effective, timely, and easy-to-use mechanism for consumers to cancel their subscriptions, *see id*. §§ 17602(a)(3), 17602(c).

5.     Those purchasing the Peacock Subscriptions do so by choosing either the Premium or Plus Subscription option and opting for a paid monthly or yearly subscription. As will be discussed below, the enrollment process for a Peacock Subscription on the Peacock Platform uniformly violates each of the core requirements of the ARL. Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Peacock Subscriptions.

6.     Specifically, Defendant systematically violates the ARL by: (i) failing to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in violation of Section 17602(a)(1); (ii) charging consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Section 17602(a)(2); and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel

in a manner that is capable of being retained by the consumer, in direct violation of Section 17602(a)(3). *See* Cal. Bus. & Prof. Code §§ 17602(a)(1)-(3); *see also id.* § 17601(b)(1)-(5) (setting forth definition of "automatic renewal offer terms" as used in Cal. Bus. Prof. Code § 17602(a)). The acknowledgment also fails to disclose a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Peacock Subscriptions, in violation of Section 17602(c) of the ARL.

7.      As a result, all goods, wares, merchandise, or products sent to Plaintiff and the Class under the automatic renewal of continuous service agreements are deemed to be "unconditional gifts" under the ARL.  *See* Cal. Bus. & Prof. Code § 17603.

8.      For the foregoing reasons, Plaintiff brings this action individually and on behalf of all California purchasers of any of Defendant's Peacock Subscriptions from the Peacock Platform who, within the applicable statute of limitations period up to and including the date of judgment in this action, incurred unauthorized fees for the renewal of their Peacock Subscriptions.  Based on Defendant's unlawful conduct, Plaintiff seeks damages, restitution, declaratory relief, injunctive relief, and reasonable attorneys' fees and costs, for: (1) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (2) conversion; (3) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (4) unjust enrichment/restitution; (5) negligent misrepresentation; and (6) fraud.

## THE PARTIES

9.      Plaintiff Holly Winston is a citizen of California, residing in Mather, California.

10.     Defendant Peacock TV LLC., ("Peacock" or "Defendant") is a Delaware limited liability company with its corporate headquarters and principal place of business located at 30 Rockefeller Plaza, 46th Floor, New York, NY 10112.  Peacock is one of the leading industry streaming platforms that offers a variety of content, including, movies, TV shows, news, sports, and pop culture on Peacock TV, as well as original shows and exclusive live events. Defendant

owns and operates the Peacock Subscriptions, which it markets to consumers through the Peacock Platform. Defendant is responsible for the promotion, advertisement, and/or marketing of the Peacock Subscriptions, and it owns and operates the Peacock Platform. Defendant sells – and, at all times during the Class Period, sold – the Peacock Subscriptions in California and has done business throughout California and the United States.  In connection with the Peacock Subscriptions, Defendant made automatic renewal offers to consumers in California and throughout the United States via the Peacock Platform during the Class Period.

11.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims for all members of the proposed class are in excess of $5,000,000.00, exclusive of interests and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, is a citizen of a state different from Defendant.

13.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in New York.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## FACTUAL BACKGROUND

### A.    Background On The Subscription e-Commerce Industry

15.    The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[7] Subscription e-commerce services now target a wide range of customers and cater to a variety of specific interests.  Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years.  Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[8]  Analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[9]  That constitutes an average annual growth rate of 18%, which makes the subscription economy "one of the fastest-growing industries globally."[10]

16.    The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years.  According to

[7] Core DNA, *How to Run an eCommerce Subscription Service: The Ultimate Guide* (May 19, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services.

[8] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it* (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[9] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%.").

*See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (Apr. 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits?* (Oct. 7, 2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right-now-but-are-you-reaping-the-full-benefits-02434851.

[10] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra* ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); *see also* Juniper Research, *Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally* (Oct. 12, 2020), https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake (acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

*Forbes*, "[t]he subscription e-commerce market has grown by more than 100% percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[11]  Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[12]  "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow generation."[13]  Thus, "[t]he share prices of most subscription companies have performed well in recent years."[14]

17.     Defendant has been riding that wave.  Defendant first launched the subscription Peacock TV service on July 15, 2020, when it introduced paid subscriptions offerings available through the Peacock Platform in various tiers (*i.e.*, the Peacock Subscriptions). As of the second quarter of 2023, the Peacock TV subscription service had 24 million subscribers.[15]

18.     The expansion of the subscription e-commerce market shows no signs of slowing. "We're now in the subscriptions era, and the pandemic is accelerating its takeover.  During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[16]  According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[17]

---

[11] Forbes, *The State Of The Subscription Economy, 2018* (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[12] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra*.

[13] *Id*.

[14] *Id*.

[15] https://www.statista.com/statistics/1246902/number-sign-ups-peacock-united-states/

[16] *Id*.

[17] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

19.     However, as *The Washington Post* has noted, there are downsides associated with the subscription-based business model.[18]  While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[19]  In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[20]  Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[21]  As these companies have realized, "[t]he real money is in the inertia."[22]  As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[23]  That is, to facilitate consumer inertia, a number of subscription e-commerce companies, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans.  They do this by intentionally confusing users with the design and flow of their websites and apps, *e.g.*, by making promises of 'free trials' that convert after only a matter of days, and

---

[18] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[19] McKinsey & Company, *Thinking inside the subscription box: New research on e-commerce consumers* (Feb. 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[20] *Id.*

[21] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[22] *Id*.

[23] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (Jun. 25, 2019), https://www.businessinsider.com/dark-patterns-online-shopping-princeton-2019-6.

other misleading tactics," such as failure to fully disclose the terms of its automatic renewal programs.[24]

20.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[25]  Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[26]  For instance, numerous companies, including Defendant, have resorted to using "dark patterns" on their e-commerce platforms.  A dark pattern is "a user interface carefully crafted to trick users into doing things they might not otherwise do, such as … signing up for recurring bills."[27]  Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts[ and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[28] widespread utilization of misleading dark patterns and deliberate omissions persist.

21.     Defendant has successfully implemented these tactics.  Peacock "has come a long way, from just $778 million in revenue for 2021 (which it ended with 9 million paid subscribers)

---

[24] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[25] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), *supra* ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[26] *Id*.

[27] UX Design, *Dark patterns in UX: how designers should be responsible for their actions* (Apr. 15, 2018), https://uxdesign.cc/dark-patterns-in-ux-design-7009a83b233c (quoting UX designer Harry Brignull (PhD Cognitive Science), who coined the term "Dark Patters" in August 2010).

[28] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), *supra*.

to over $2 billion in 2022 revenue and ending the year with 21 million paid subscribers."[29] Thus, Defendant has enjoyed rapid growth to the subscriber count of the Peacock Subscriptions in light of the fact that "[o]verall time spent streaming has more than doubled since March[ 2020], when the U.S. and other countries largely shut down due to COVID-19."[30]

**B.      Defendant's Dark Patterns And Online Consumer Complaints About the Peacock Subscriptions**

22.      Defendant's recent growth in revenues and subscriber count with respect to its Peacock Subscriptions coincides with a sharp decline in subscriber satisfaction as the Peacock Subscriptions and the platforms from which they operate have become riddled with "dark patterns."  Specifically, Defendant has been using various types of dark patterns, including but not limited to "roach motel,"[31] "misdirection,"[32] and "forced continuity,"[33] in order to prevent user unsubscription from the Peacock Subscriptions by adopting complex cancellation procedures to increase the friction in the subscription cancellation process.  Defendant's utilization of these dark patterns – especially in conjunction with its failure to fully disclose the terms of its automatic-renewal programs (discussed further below) – has led to a reduction in churn rates by making it next to impossible for subscribers to cancel their Peacock Subscriptions. It has further led to an increase in accidental or unintentional sign-ups by

---

[29] Forbes, *Peacock Busts Through 22 Million Subscriber Mark: Peak Losses In 2023 At $3 Billion* (April 30, 2023), https://www.forbes.com/sites/derekbaine/2023/04/30/peacock-busts-through-22-million-subscriber-mark--peak-losses-in-2023-at-3-billion/?sh=284950d5f980

[30] Deadline, *Ad-Free Subscription Growth Outpaces Ad-Supported Fare During COVID-19* (May 29, 2020), https://deadline.com/2020/05/subscription-streaming-growth-outpaces-free-ad-supported-during-covid-19- 1202946438/

[31] "Roach motel" refers to a "design [that] makes it very easy for [consumers] to get into a certain situation, but then makes it hard for [consumers] to get out of it (e.g. a subscription)." https://www.darkpatterns.org/types-of-dark-pattern/roach-motel.

[32] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another."  In many cases, "[w]hat's deceptive is the way [the website] presents [purchase] options: it uses misdirection to hide what is actually happening[.]"  https://www.darkpatterns.org/types-of-dark-pattern/misdirection.

[33] One example of "forced continuity," another type of dark pattern, is where customers' sign up for a "free trial with a service[ that] comes to an end and [their] credit card silently starts getting charged without any warning.  [The subscriber is] are then not given an easy way to cancel the automatic renewal."  https://www.darkpatterns.org/types-of-dark-pattern/forced-continuity.

consumers for paid Peacock Subscriptions, in effect increasing subscriber count and, thus, Defendant's overall revenues from renewal fees.[34]

23.    Peacock's use of dark patterns was featured on the deceptive patterns "hall of shame" for the way in which it obfuscates the unsubscribe link by having it at the bottom of the communication emails, written in faint grey font on a grey background.[35]



24.    Defendant continues to employ these deceptive tactics to lure consumers into enrolling, and remaining enrolled, in paid Peacock Subscriptions. Defendant's conduct has drawn the attention and ire of customers across the country, with countless angry customers taking to the Internet to voice their discontent over Defendant's broken promises.

_____

[34] *See* Gizmodo, *Pervasive 'Dark Patterns' Are Fooling People Into Signing Up for Services They Don't Want* (Sep. 15, 2022), https://gizmodo.com/dark-patterns-ui-cancel-subscription-1849542166 ("As much as you think you have full control of you and your wallet, it's getting increasingly difficult for anybody using an app or a website to avoid getting suckered into surrendering your money or personal information to misleading or tricky UI design. … Tech companies and online retailers [] lure users into signing up for subscription services while obscuring costs or charges, then making it difficult to actually cancel.  Some dark patterns include confusing users in dense terms of service to obscure key limitations of products or junk fees attached to their use.")

[35] https://www.deceptive.design/brands/peacock-tv

25.     For instance, numerous subscribers have left scathing reviews[36] and complaints[37] on the Better Business Bureau website, complaining of confusion regarding obscured or undisclosed subscription terms, such as Defendant's unclear free trials, billing practices and the baffling cancellation policy associated with the Peacock Subscriptions.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

---

[36] https://www.bbb.org/us/ny/new-york/profile/streaming-service/peacock-tv-llc-0121-87152436/complaints (last accessed September 15, 2023).

[37] https://www.bbb.org/us/ny/new-york/profile/streaming-service/peacock-tv-llc-0121-87152436/customer-reviews (last accessed September 15, 2023).



**Kittie K**

⭐☆☆☆☆                                                                                                  06/11/2023

If I could give zero stars I certainly would do so! I have had to complain about Peacock TV three separate times in the last eight months. When I log in to my account it says I have a free account. However, monthly payments are being withdrawn from my account through Amazon.com. Our of frustration I've tried to follow the instructions on my tv asking me to upgrade. I attempt to upgrade and it then says I can't upgrade because I already have a paid plan! I see that there are an amazingly high number of consumers on the internet having the same problems. How can a consumer hold a big streaming company like this accountable for what seems like fraudulent activity for so many people? Can something be done about Peacock TV's unethical business practices regarding its subscriptions?- ****************************



**Brian H**

⭐☆☆☆☆                                                                                                  02/19/2023

I wound up with a fraudulent credit card reoccurring monthly charge. There is no way to get anyone to stop the charges or help you. Since I never used them I have no inline account. There seems to be no real infrastructure or people monitoring this company for service.



**Gary D**

⭐☆☆☆☆                                                                                                  11/16/2022

Peacock said we would be able to get the promo price when our month subscription ended which was to be $19.99 for a year. As long as we did it by November 19th now on November 16th they tell me the promo is no longer available. I have the email they sent to me that says everything I'm telling you. All I want is what I was promised. ****





**J. M.**

⭐☆☆☆☆                                                                                                  07/15/2022

Very sketchy business practices. It is impossible to cancel the account on your own. Then when you try to reach out to customer service they harass you trying to get you not to cancel. I would have re-subscribed the next season ***** ** **** came out but you couldn't pay me to ever use them again.



---



**Initial Complaint**          **Complaint Type:** Problems with Product/Service
05/19/2023                     **Status:** Resolved 🛈

I cancelled my service with Peacock- my service was canceled as requested but they still went ahead a withdrew fees. Which also caused my account to go overdrawn- so **** for service I no longer have plus an additional ***** in overdraft fees. ( I had $3.00 In my account ) I tried calling their customer service number- which I have to say why bother ??? No one answers. I tried another number ************** which was linked to the Peacock- only to get a recording- which tells me to log in to my Peacock account- to reach customer service. BIG PROBLEM !!! I cant log in-since my account/ service was canceled it wont let me - so even though funds have been taken out- I would have to re-start to get any access. Not very user friendly- not recommended ever. Customer service? What customer service? I just would like ALL my fees refunded.

---



**Initial Complaint**          **Complaint Type:** Billing/Collection Issues
07/18/2023                     **Status:** Resolved 🛈

Have been trying to discontinue disconnect service from this company, they are making it completely impossible to stop charging my credit card every month. Theres no way to contact them in a reasonable way shape or form and I want to close my account immediately. Please advise.

26.     Other subscribers to the Peacock Subscriptions left similar complaints on the

Trust Pilot's website, leaving the service with an overall score of 1.3 out of 5 stars based on 452

submissions:[38]



27.     The above reviews are just a sampling of numerous negative reviews consumers

have left regarding Defendant's Peacock Subscriptions and the unclear cancellation policies and

confusing billing associated with the Subscriptions. As discussed below, the above online

---

[38] https://www.trustpilot.com/review/www.peacocktv.com (last accessed September 15, 2023).

consumer complaints reveal a widespread pattern of uniform unlawful conduct by Defendant, underscoring the artifice devised and employed by Defendant to lure and deceive millions of consumers into enrolling, and remaining enrolled, in their paid Peacock Subscription programs.

### C.    California's Automatic Renewal Law

28.    In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq*., with the intent to "end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." Cal. Bus. & Prof. Code § 17600 (statement of legislative intent). More recently, in 2018, California's Senate Bill 313 amended Section 17602 of the ARL, adding new requirements meant to increase consumer protections for, among other things, orders that contain free trial and promotional pricing, and subscription agreements entered into online. The California Legislature again amended the ARL in 2022, adding additional notice, disclosure, and cancellation requirements. *See* Cal. Bus. & Prof. Code §§ 17602(a)(4)(A)-(E), 17602(b)(1)-(2), 17602(d)(1)-(3).

29.    The ARL makes it "unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (1)  Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer. If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.
>
> (2)  Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.
>
> (3)  Fail to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation

> policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer.  If the automatic renewal offer or continuous service offer includes a free gift or trial, the business shall also disclose in the acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services.

Cal. Bus. & Prof. Code § 17602(a)(1)-(3).

30.     As of 2018, the updated ARL also requires that, prior to the completion of the initial order for the automatic renewal or continuous service, sellers must explain the price to be charged when the promotion or free trial ends.  *See* Cal. Bus. & Prof. Code § 17602(a)(1), *supra*. If the initial offer is at a promotional price that is only for a limited time and will increase later, the seller must obtain consumer consent to the non-discounted price prior to billing.  *See id*. Sellers must also notify consumers in the acknowledgment about how to cancel the free trial before they are charged.  *See* Cal. Bus. & Prof. Code § 17602(a)(3), *supra*.

31.     Section 17602(c) of the ARL further provides:

> A business that makes an automatic renewal offer or continuous service offer **shall provide a toll-free telephone number, electronic mail address**, a postal address if the seller directly bills the consumer, **or it shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation** that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a).

Cal. Bus. & Prof. Code § 17602(c). (emphasis added).

32.     Additionally, following the 2018 and 2022 amendments to the ARL, the updated law also requires e-commerce sellers, doing business in California, to allow online cancellation of auto-renewing memberships or recurring purchases that were initiated online.  Specifically, Section 17602(d) provides:

> [A] business that allows a consumer to accept an automatic renewal or continuous service offer online shall allow a consumer to terminate the automatic renewal or continuous service *exclusively online, at will, and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal or continuous service immediately*.

Cal. Bus. & Prof. Code § 17602(d)(1) (emphasis added).

33.     The updated ARL further specifies that a seller who provides an automatic offer "shall provide a method of termination that is online in the form of either of the following: (A) A prominently located direct link or button which may be located within either a customer account or profile, or within either device or user settings[; or] (B) By an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information." Cal. Bus. & Prof. Code § 17602(d)(1)(A)-(B).

34.     Section 17601(a) of the ARL defines the term "Automatic renewal" as a "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term."  Cal. Bus. & Prof. Code § 17601(a).

35.     Section 17601(b) of the ARL defines the term "Automatic renewal offer terms" as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing agreement will continue until the consumer cancels.  (2) The description of the cancellation policy that applies to the offer.  (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known.  (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer.  (5) The minimum purchase obligation, if any."  Cal. Bus. & Prof. Code § 17601(b).

36.     Pursuant to Section 17601(c) of the ARL, "clear and conspicuous" or "clearly and conspicuously" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbol ls or other marks, in a manner that clearly calls attention to the language."  Cal. Bus. & Prof. Code § 17601(c).

37.     Finally, Section 17603 of the ARL provides that where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]"

the material sent will be deemed "an unconditional gift to the consumer, who may use or dispose of the same in any manner he or she sees fit without any obligation whatsoever on the consumer's part to the business[.]"  Cal. Bus. & Prof. Code § 17603.

38.     As alleged below, Defendant's practices on the Peacock Platform systematically violates Sections 17602(a)(l), 17602(a)(2), 17602(a)(3), 17602(c), and 17602(d) of the ARL.

**D.     Defendant's Business: The Peacock Subscription Enrollment Process**

39.     At all relevant times, Defendant offered, via the Peacock Platform, various Peacock Subscriptions for access to exclusive Peacock content, products, and/or services on a contract or fee basis.  The Peacock Subscriptions are offered on a recurring basis for monthly or yearly renewal terms, and all plans automatically renew at the end of the defined renewal term unless the subscriber cancels.  For example, when customers sign up for a yearly Peacock Premium Subscription, after the initial one-year renewal term, their subscriptions are automatically renewed and their Payment Methods are charged the full standard recurring amount associated with the yearly Peacock Premium Subscription, currently $59.99 (exclusive of tax), for the next year, and every year thereafter if they do not cancel.  Likewise, when customers sign up for a monthly Peacock Premium Subscription, after the initial one-month renewal term, their subscriptions are automatically renewed and their Payment Methods are charged the full standard recurring amount associated with Peacock Premium Subscription, currently $5.99 (exclusive of tax), for the next month, and every month thereafter if they do not cancel.  Similarly, when customers sign up for a yearly Peacock Plus Subscription, after the initial one-year renewal term, their subscriptions are automatically renewed and their Payment Methods are charged the full standard recurring amount associated with Peacock Plus Subscription, currently $119.99 (exclusive of tax), for the next year, and every year thereafter if they do not cancel. Finally, when customers sign up for a monthly Peacock Plud Subscription, after the initial one-month renewal term, their subscriptions are automatically renewed and their Payment Methods are charged the full standard recurring amount associated with Peacock Plus Subscription, currently $11.99 (exclusive of tax), for the next month, and every month thereafter

if they do not cancel. Defendant also offers each of the Peacock Subscription plans on a free trial for a limited period of time from time to time, in which case, at the end of the initial trial period, customers' subscriptions are converted to paid annual Peacock Subscriptions and their Payment Methods are automatically charged the full renewal rate associated with that subscription plan for the next billing period, and every subsequent renewal term thereafter if they do not cancel. Defendant's Peacock Subscriptions constitute automatic renewal and/or continuous service plans or arrangements for the purposes of Cal. Bus. & Prof. Code § 17601.

40.    Consumers can sign up for one of Defendant's Peacock Subscription plans through the Peacock Website or, in some cases, the Peacock App.  Defendant automatically enrolls customers who purchase a paid Peacock Subscription or free trial via the Peacock Website and/or the Peacock Apps in their chosen Peacock Subscription program going forward, by default.  In addition, customers may sign up for several of the Peacock Subscriptions on a free-trial and/or promotional basis (*i.e.*, at a discounted renewal rate), for a limited time. Nevertheless, customers that enroll in a free trial or discounted rate must, like those that sign up for a straight-to-paid Peacock Subscription, provide Defendant their payment information at the time of enrollment.  Customers' free trial subscriptions automatically convert to paid subscriptions at the end of the trial period, at which point those users are also automatically enrolled by Defendant in a paid Peacock Subscription program, and as such their Payment Methods are automatically charged by Defendant on a recurring monthly or yearly basis in the amount of the full standard or time-limited promotional rate associated with that program, continuing indefinitely until the customer takes affirmative steps to cancel.

41.    The enrollment process for each Peacock Subscription at issue is substantially the same, regardless of the medium used. For instance, after selecting one of the Peacock Subscriptions, those navigating the enrollment process on the Peacock Website are directed to a final webpage (the "Checkout Page"), where prospective subscribers are prompted to input their

payment information and then invited to complete their purchase.[39] For the purposes of the ARL and this Complaint, the "relevant portion of the Checkout Page" refers to the text of that portion of the Checkout Page that appears "in visual proximity to the request for consent to the offer[,]" which in this case pertains to the text nearby the final yellow button that customers must press in order to complete the checkout process.

42.     By way of example, when a consumer signs up for a Peacock Premium Subscription, the "relevant portion of the Checkout Page" refers to the disclosures contained in the block of black text to the right of the yellow "Create Account" checkout button at the bottom of the page (*i.e.*, the "request for consent"), which contains the following language and appearance (red box added for emphasis):

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

---

[39] Defendant requires basic users to register or create an account in order to utilize features on the Peacock Platform, so prospective subscribers to any of the Peacock Subscriptions must either create a Peacock account or "sign in" to a preexisting Peacock account before they can reach the Checkout Page.



43.     The layout and text of the Checkout Page for each of the paid Peacock Subscriptions is aesthetically and functionally similar to the Checkout Page for the above-illustrated Peacock Premium Subscription.

44.     Furthermore, to the extent that any of the material terms required to be disclosed by the ARL appear on the Checkout Page pictured above, they appear in the red boxes added for emphasis, in the "Your Plan" column toward the right of the Checkout Page and checkout button.  However, given the distance between all such terms and the yellow "Pay Now" checkout button on the Checkout Page, none of the terms in these portions of the Checkout Page within "visual proximity" to the yellow "Pay Now" checkout button on that Page, as the ARL requires.  *See* Cal. Bus. & Prof. Code § 17602(a)(1).  Moreover, given the relatively tiny font size of these terms, among other aesthetic features, none can be considered "clear and conspicuous" as required by Section 17602 of the ARL and defined by Section 17601(c).  Thus,

as is explained in greater detail below, the Checkout Page fails to adequately disclose *any* of the five categories of automatic renewal offer terms required to be disclosed by the ARL.

45. Regardless of how the consumer subscribes (via the Peacock Website, on either its desktop or mobile format, or the Peacock App), and irrespective of which Peacock Subscription or of which specific plan the subscriber selects (whether the straight-to-paid, free trial, or promotional subscription options, and whether for monthly or annual renewal periods), Defendant fails to disclose the full terms of its automatic renewal programs either before or after checkout, and it never requires the individual consumer to read or affirmatively agree to any terms of service, *i.e.*, by requiring consumers to click a checkbox next to the automatic renewal offer terms before consumers complete the checkout process and submit their orders for their Peacock Subscriptions. Consequently, Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to – their subscribers before charging consumers' Payment Methods on a recurring basis.

**E.      Defendant Violates California's Automatic Renewal Law**

46. At all relevant times, Defendant failed to comply with the ARL in three ways: (i) Defendant failed to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement was fulfilled, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (ii) Defendant charged Plaintiff's and Class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (iii) Defendant failed to provide an acknowledgment that included the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3).  Defendant also fails to provide an acknowledgment that discloses a toll-free telephone number or describes another cost-effective, timely, and easy-to-use mechanism for cancellation, and, in fact, Defendant

makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Peacock Subscriptions, in violation of Cal. Bus. & Prof. Code §§ 17602(c) and 17602(d).

> **i.    Defendant Fails To Clearly And Conspicuously Present The Peacock Subscription Terms Before The Subscription Agreement Is Fulfilled And In Visual Proximity To The Request For Consent To The Offer.**

47.    First, the Checkout Page for the Peacock Subscriptions does not present the complete "automatic renewal offer terms[,]" as defined by Cal. Bus. & Prof. Code § 17601(b), in violation of Section 17602(a)(1) of the ARL.  Specifically, using the pictured free trial and straight-to-paid Standard Checkout Pages above as examples, the Checkout Page does not clearly and conspicuously disclose that "the subscription or purchasing agreement will continue until the consumer cancels."  Cal. Bus. & Prof. Code § 17601(b)(1).  For instance, although the relevant portion of the above-pictured Checkout Pages indicate – albeit vaguely (which is to say, not "clearly" within the meaning of Cal. Bus. & Prof. Code § 17601(c)) – that "[consumers] will be charged $5.99/month" and that their "subscription will auto-renew until [the consumer] cancel[s]" *see supra* ¶¶ 42, (emphasis added), it does not clearly explain that the Peacock Subscriptions "will continue ***until the consumer cancels***" or otherwise provide that the consumer *must* cancel the subscription program in order to avoid incurring automatic renewal charges on a recurring basis.  In fact, as discussed in greater detail below, the Checkout Page does not alert consumers about the nature or extent of Defendant's recurring subscriptions, thus making it impossible to ascertain what, if anything, they would be canceling. Therefore, a reasonable consumer reviewing and relying on the Checkout Page would not be placed on notice of the automatically renewing nature of the Peacock Subscriptions, or of the fact that cancellation by the subscriber is required in order to stop Defendant from automatically charging renewal fees to customers' Payment Methods on a recurring and indefinite basis.  Moreover, numerous words and intervening text fields appear on the Checkout Page between the bottom-right quoted text and the yellow "Pay Now" checkout button (*i.e.*, the request for consent). In other words, the quoted text and the checkout button are separated by a significant amount of

space and content in the Checkout Page.  Thus, (as noted above) given the distance between all this text and the green "Pay Now" checkout button on the Checkout Page, the terms in the quoted portion of the Checkout Page are not presented within the "visual proximity" required by the ARL.  *See* Cal. Bus. & Prof. Code § 17602(a)(1).  Thus, none of the so-called disclosures provided on the Checkout Page in this block of text are capable of satisfying the ARL.

48.    Moreover, the quoted text in question fails to satisfy the ARL's "clear and conspicuous" requirement because it is overshadowed by the more prominent price breakdown, and the information provided therein is presented in tiny basic black font (9 point to be exact) against a grey background without emphasis or distinction, and it is provided in a *smaller* size text as compared to most other text of the Checkout Page.  Indeed, much of the other text of the Checkout Page is significantly larger (ranging from 12 to 15 point font) and, in effect, more visually prominent than any of these so-called disclosures at the bottom right of the Checkout Page less conspicuous by comparison to the rest of the webpage and ultimately distracts the eye away from such small text and towards the larger text featured on the majority of the Checkout Page.  Further, the disclosure in the relevant portion of the Checkout Page is presented alongside – and thus, rendered even more inconspicuous by – other, unrelated disclosures of the same font type and size within the same block of text (*i.e.*, the "Terms of Use" and "Privacy Policy"), which provides information not required by the ARL, and it is not presented in contrasting font type to the immediately surrounding text, emphasized, or otherwise set off from any other text of the Checkout Page by symbols, marks, graphics, or any other distinguishing factors that clearly call attention to the language.  In other words, the disclosure was presented in such a way that it could be, and was, easily overlooked, and is therefore not "clear and conspicuous" as defined by the ARL, *see* Cal. Bus. & Prof. Code § 17601(c).[40]  Accordingly, Defendant fails to disclose that

---

[40] Based on these features, this block of text placed near the bottom of the Checkout Page and all statements and disclosures buried therein constitute "fine print."  *See Fine Print*, Black's Law Dictionary (9th ed. 2009) (defining "fine print" as "[t]he part of an agreement or document—usu. in small, light print that is not easily noticeable—referring to disclaimers, restrictions, or limitations."); *see also Fine Print*, The Law Dictionary, *available at* https://thelawdictionary.org/fine-print/ (defining "Fine Print" as "[a] small type size that

the Peacock Subscriptions "will continue until the consumer cancels," *id*. § 17601(b)(1), in the manner required by statute, *see id*. § 17602(a)(1).

49.     For the same reasons, Defendant also fails to present a complete "description of the cancellation policy that applies to the offer[,]" *see* Cal. Bus. & Prof. Code § 17601(b)(2). For instance, although the relevant portion of the Checkout Page notes that the Peacock Subscriptions "will auto-renew until [the consumer] cancel[s]" and that they can "[c]ancel at any time by visiting [their] Account" can " *see supra* ¶¶ 42, (emphasis added), this block of text is not presented with the requisite "visual proximity" to the green checkout button on the Checkout Page and are therefore incapable of satisfying the ARL.  *See* Cal. Bus. & Prof. Code § 17602(a)(1).  Likewise, these statements are easily overlooked because they are presented in comparably tiny text, without emphasis or distinction to call attention to the language, and alongside unrelated disclosures not required by the ARL.  Therefore, as noted above, they are not "clear and conspicuous" under the ARL, *see* Cal. Bus. & Prof. Code § 17601(c).

50.     More importantly, these statements are completely silent about *how* and *by when* a subscriber must cancel their Peacock Subscriptions and thus do not constitute a fulsome or clear description of Defendant's cancellation policy.  Indeed, other webpages of the Peacock Website beyond the Checkout Page – none of which are shown to subscribers during the enrollment process – disclose the existence of a cancellation deadline and explain the consequences of failing to cancel the Peacock Subscriptions in advance of that deadline.  For

---

contracts and policy are sometimes printed in" and noting that "[t]he print is small as it relates to rules, deductions, exlusions, and reductions of a policy" and that "[i]t is smaller print than the main part of the document").  **That it is exactly the type of deceptive practice that the California Legislature sought to deter and penalize when it enacted the ARL**.  *See Turnier v. Bed Bath & Beyond Inc.*, 517 F. Supp. 3d 1132, 1140 n.6 (S.D. Cal. 2021) (ARL Case) ("Notably, the practice that led to ARL was the inclusion of autorenewal terms in fine print."); *see also Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) ("Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print.  Because 'online providers have complete control over the design of their websites,' 'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.") (internal citations omitted).  As a result, any disclosures contained within the relevant portion of Defendant's Checkout Pages – which bury incomplete, unclear, and inconspicuous disclosures regarding required terms in fine print – fail to comply with the ARL.

instance, the Terms of Service clarifies that the cancellation must "occur before the end of the current billing period" and that the billing [period] may not occur on the same date of each month, depending on when you signed …[b]y way of example, if you sign up for a monthly subscription on July 31, you will be billed on/near August 31, September 30, etc.)."[41] Because this information is entirely missing from the Checkout Page, Defendant fails to inform consumers of the actual date (approximately a month after their initial purchase) or time that they must cancel their Peacock Subscriptions in order for the cancellation to be valid. Furthermore, the Checkout Page fails to inform consumers how to cancel their Peacock Subscriptions. For example, the relevant portion of the Checkout Page fails to inform consumers that if they "subscribed through a third party (e.g., Apple, Google, Roku, etc.), [they] must contact such third party directly to cancel [their] existing plan, as Peacock does not have the ability to cancel your existing plan."[42] (emphasis added). In addition, the Checkout Page does not break down the steps that a consumer must click through to cancel their subscriptions through their "Account," nor does it provide a simple hyperlink to do so, as provide elsewhere on its Website.[43] Finally, Defendant fails to inform consumers that despite being unable to receive a refund after cancelling, they nonetheless  can "still watch a limited amount of content for free on Peacock."[44] Defendant does this by design to reduce the number of cancellations.

51.     The above-discussed terms omitted from the Checkout Page constitute material aspects of Defendant's cancellation policy.  As a result of the inadequate disclosures and/or outright omissions on the Checkout Page, Plaintiff was not previously aware of these aspects of Defendant's cancellation policy.  At no point during the life of her Peacock Subscription was

---

[41] Peacock, *Terms of Use*, www.peacocktv.com/terms (last accessed Sept. 15, 2023).

[42] Peacock, Help Center, www.peacocktv.com/help/article/cancellation (last accessed Sept. 15, 2023).

[43] *Id.* ("To cancel your plan, follow the steps below: Log in to your account. Go to Plans & Payments. Select Change or Cancel Plan. Select Cancel Plan. Once confirmed, you will see a confirmation message on screen and receive a confirmation email, which may take a few hours. Your plan will not renew at the end of your current billing cycle.") (emphasis added).

[44] *Id.*

Plaintiff required or even prompted to navigate to or otherwise examine any of the terms disclosed on any other page of the Peacock Platform aside from the Checkout Page.  Yet, prior to checkout, Defendant was obligated by law to place consumers on notice of these aspects of Defendant's <u>complete</u> cancellation policy in accordance with the ARL, which requires that companies provide such information "in visual proximity to the request for consent to the [automatic renewal] offer."  Cal. Bus. & Prof. Code § 17602(a)(1); *see also id.* § 17601(b)(2).[45] It is not enough that the cancellation policy may be set forth on the hyperlinked pages located elsewhere on the Peacock Website; the ARL requires that Defendant present its full cancellation policy directly on the Checkout Page – and it must further do so "clearly and conspicuously," *id.* § 17601(c), and with the requisite proximity (*i.e.*, they must appear in the block of text immediately to the right the green request for consent button on the bottom of that page), *see id.* § 17602(a)(1) – so as to allow the consumer to read and review the applicable offer terms immediately prior to purchase.[46]  However, Defendant failed, and continues to fail, to satisfy that requirement, in violation of Section 17602(a)(1) of the ARL.

52.     Similarly, the relevant portion of the Checkout Pages for the Peacock Subscriptions does not adequately disclose the recurring amount to be charged to the subscriber's Payment Method each billing period.  For instance, while the relevant portion of the Checkout Pages shown above indicate that subscribers will be "charged $5.99/month for Peacock Premium minus applied offers plus applicable taxes," *see supra* ¶¶ 42, this statement is

---

[45] *See, e.g.*, *Johnson v. Pluralsight, LLC*, 728 F. App'x 674, 677 (9th Cir. 2018) ("[Plaintiff's] complaint alleges that [defendant] violated the ARL by charging him without first providing information on how to cancel the subscription.  The record also indicates that consumers signing up for trial subscriptions were not specifically given instructions on how to cancel before payment.  This amply satisfies the UCL requirement that an unlawful business practice be any violation of 'other laws.'") (emphasis added and internal citations omitted); *Lopez v. Stages of Beauty, LLC*, 307 F. Supp. 3d 1058, 1071–72 (S.D. Cal. 2018) ("The webpage does not include information instructing the subscriber that they must call th[e listed] phone number at least one day prior to the date the next monthly delivery ships.  Accordingly, Plaintiff sufficiently alleges that Defendant's 'description of the cancellation policy that applies to the offer' is incomplete, and therefore, it is plausible that the incomplete cancellation policy violates the ARL.") (citation omitted).

[46] *See supra* fn. 36 and *infra* fn. 49 (citing *Turnier,* 517 F. Supp. 3d 1132 and *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022)).

presented in the same block of tiny text at the bottom of the Checkout Page as the disclosure discussed in the paragraph above.  Thus, this statement suffers from the same inconspicuousness and related deficiencies as noted above in that it is also buried in the fine print of the Checkout Page and is likewise easily overlooked.  Therefore, the disclosure is not "clear and conspicuous" as defined by the ARL, *see* Cal. Bus. & Prof. Code § 17601(c).  In fact, the statement is rendered even more inconspicuous by the much large price figure provided above the block of text in question and immediately next to bold text stating "Today's Total."  Further, this price larger figure also fails to satisfy the ARL because it only places consumers on notice of the amount to be charged to their Payment Methods on that particular day, but provides no indication of the *recurring* amount to be charged to the subscriber's Payment Method *each billing period*. Moreover, the recurring monthly price listed (albeit inconspicuously) fails to disclose that Defendant "reserve[s] the right to **change the terms** of your subscription, **including price**, from time to time."[47] Thus, Defendant fails to provide notice of "[t]he recurring charges that will be charged to the consumer's [Payment Method] as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known[,]" *see* Cal. Bus. & Prof. Code § 17601(b)(3), in violation of Section § 17602(a)(1) of the ARL.

    53.    Additionally, the Checkout Pages for the Peacock Subscriptions also fail to adequately disclose the length of the automatic renewal term associated with the Peacock Subscriptions, *see* Cal. Bus. & Prof. Code §§ 17601(b)(4), 17602(a)(1).  In particular, although the relevant portion of the Checkout Pages shown above indicate that the recurring price associated with the Peacock Subscriptions will be charged to subscribers' Payment Methods by Defendant "$5.99/month," *see supra* ¶¶ 42, this statement is presented in the same block of tiny text at the bottom of the Checkout Page as the text concerning automatic renewal feature and recurring price discussed above.  Thus, this statement suffers from the same inconspicuousness and related deficiencies as noted above in that it is also buried in the fine print of the Checkout

---

[47] Peacock, *Terms of Use*, www.peacocktv.com/terms (last accessed Sept. 15, 2023).

Page and is likewise easily overlooked.  Therefore, the disclosure is not "clear and conspicuous" as defined by the ARL, *see* Cal. Bus. & Prof. Code § 17601(c).  Further, even if this text were conspicuous and made unequivocally clear to reasonable consumers that the Peacock Subscriptions are subject to automatic renewal terms (it is neither), the precise date of a given billing period that the consumer will be charged in connection with the Peacock Subscriptions remains unclear, as discussed *supra* ¶ 50.  As a result, the exact length of each renewal term is ambiguous in terms of start and end date—and this information is also necessary for consumers to successfully affect cancellation because, as noted above, consumers must cancel their Peacock Subscription before their "billing period."  *See supra* ¶ 50.  This problem is compounded by the fact that directly underneath the bold text stating "Today's Total," another statement (also in bold text) states "Then, $5.99/month (+tax)." As a result, it is unclear whether that disclosure is merely superfluous to the at-issue automatic-renewal disclosures underneath, or, instead, indicates that a consumer may choose to manually renew the Peacock Subscriptions at the "[t]hen" priced amount at "$5.99/month (+tax)" for subsequent months or, alternatively, choose to enroll into an auto-renewal payment plan. *See supra* ¶ 42.  As such, Defendant fails to disclose "[t]he length of the automatic renewal term or that the service is continuous" in the manner required by the ARL. Cal. Bus. & Prof. Code § 17601(b)(4); *see also id.* § 17602(a)(1).

54.     As a result of Defendant's missing and otherwise deficient pre-purchase disclosures, when Plaintiff selected and enrolled in her Peacock Subscription, she was unaware that Defendant enrolled her in an "automatic renewal" program under which her Peacock Subscription would renew each month and result in continuous yearly automatic renewal charges to her Payment Method, unless and until she effectively canceled the subscription.

### ii.     Defendant Fails To Obtain Consumers' Affirmative Consent To The Automatic Renewal Terms Associated With The Peacock Subscriptions.

55.     Second, at no point during the checkout process does Defendant require consumers to read or affirmatively agree to any terms of service associated with their Cricut Subscriptions, *i.e.*, by requiring consumers to select or click a "checkbox" next to the automatic

renewal offer terms to complete the checkout process.  Nor does Defendant Accordingly, when Defendant automatically renews customers' Peacock Subscriptions, Defendant charges consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2).

56.     Although the Checkout Page does contain a yellow "Pay Now" button which could be used as an indirect manifestation of consent to the ARL terms, to the extent that they are purportedly valid in the first place, the words "Pay Now" are not referenced within the ARL disclosure—*i.e.*, the ARL disclosure does not state that "by clicking "Pay Now" you agree to….". Instead the ARL disclosure merely states that "By subscribing, you agree to the preceding subscription terms and Terms of Use and Privacy Policy." Because the disclosure does not reference the word "Pay Now" or pressing the yellow button even once, consumers could not have "unambiguously manifest[ed] his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

       **iii.**    **Defendant Fails To Provide A Post-Checkout Acknowledgment That Clearly And Conspicuously Discloses The Required Peacock Subscription Offer Terms.**

57.     Finally, after Plaintiff and the members of the Class subscribed to one of Defendant's Peacock Subscriptions, Defendant sent to Plaintiff and the Class email follow-ups regarding their purchases (the "Acknowledgment Email").

58.     By way of example, at least as of 2022, consumers who enroll in the Standard Peacock Subscription received an email from Defendant upon completion of the checkout process.  The subject line of the Acknowledgment Email that Defendant sent to Peacock

Premium subscribers, stated: "Your Peacock Purchase." The body of the Acknowledgment
Email contained, in relevant part, the following text:



59.    The layout and text of the Acknowledgment Emails for each of the other Peacock
Subscriptions during the applicable Class Period are aesthetically and functionally similar to the
Acknowledgment Email shown above.  As the above image makes clear, the Acknowledgment
Email, like the corresponding Checkout Page, does not clearly and conspicuously disclose the
continuous nature of the subscription or purchasing agreement, the complete cancellation policy,
the recurring amount to be charged (and that the amount will change, if applicable, and to what),
or the length of applicable automatic renewal term.  Namely, the Acknowledgment Email does
not provide: that the subscription "will continue until the consumer cancels[,]" Cal. Bus. & Prof.
Code § 17601(b)(1); a "description of the cancellation policy that applies to the offer[,]" Cal.

Bus. & Prof. Code § 17601(b)(2); a statement of "[t]he recurring charges that will be charged to the consumer's [Payment Method] as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, [and] if that is the case, and the amount to which the charge will change, Cal. Bus. & Prof. Code § 17601(b)(3); or "[t]he length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer[,]" Cal. Bus. & Prof. Code § 17601(b)(4).  Disclosures of these required automatic renewal terms are either missing altogether, are deceptively incomplete, objectively inaccurate, and/or are inconspicuously buried in the tiny fine print at the bottom of the email.

60.    As such, the Acknowledgment Email fails to include full, accurate, clear, and conspicuous disclosures of "the automatic renewal offer terms … cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer[,]" in violation Cal. Bus. & Prof. Code § 17602(a)(3), and it does nothing to remedy the missing information on the relevant portion of the Checkout Page, discussed above.

61.    Additionally, the Acknowledgment Emails fail to provide a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation, and, in fact, Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Peacock Subscriptions, which further violates the ARL under Cal. Bus. & Prof. Code § 17602(c).

62.    In sum, Defendant's deficient pre- and post-purchase disclosures and lack of affirmative consent fail to comply with the ARL.  By and through these actions, Defendant has charged Plaintiff's and Class members' Payment Methods in direct violation of the ARL.  As a result, all goods, wares, merchandise, and/or products sent to Plaintiff and the Class upon the automatic renewal of their continuous service agreements are deemed to be "unconditional gifts" pursuant to Cal. Bus. & Prof. Code § 17603.

63.    Because Defendant failed to disclose this material information in the manner required by statute, Plaintiff was unable at the point of sale to accept or provide affirmative consent to Defendant's offer or knowingly enter into the purchase agreements.  Thus, as a direct

result of Defendant's missing, incomplete, and otherwise deficient disclosures, Plaintiff was induced to sign up for, unable to terminate, and automatically charged for her Peacock Subscription.

64.    Further, as a direct result of Defendant's unlawful conduct described above, Plaintiff and putative Class Members have incurred substantial financial injury in the form of all monies withdrawn from their Payment Methods in connection with the Peacock Subscriptions. Specifically, Defendant's ARL violations concerning the Peacock Subscriptions caused Plaintiff's and Class members' financial injury because they reasonably relied on the representations on Defendant's Platform and Acknowledgment Email (and, as a natural corollary, the omissions and/or the inconspicuousness of the disclosures contained therein) in deciding whether to purchase their Peacock Subscriptions in the first place and whether to continue paying for it upon after that (*i.e.*, by not cancelling the auto-renewal).

65.    Accordingly, Plaintiff brings this action individually and on behalf of similarly situated individuals against Defendant for violations of California's consumer protections statutes, including California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200.  As set forth in detail below, Plaintiff's claims, which are based on Defendant's failure to comply with the ARL, arise under the "unlawful" prong of the UCL.  Further, because the Peacock Subscriptions were, by operation of law, "unconditional gifts" to Plaintiff and putative Class Members (*see* Cal. Bus. & Prof. Code § 17603) – and thus, Plaintiff and Class Members already owned the goods, tools, and benefits of the subscriptions as their personal property at the time Defendant withdrew monies from their Payment Methods as consideration for access to the same, without any legal or contractual authority to do so – Plaintiff's claims are also based on Defendant's practice of charging consumers in exchange unconditional gifts and arise under the "fraudulent" and "unfair" prongs of the UCL.  Additionally, Plaintiff brings this action against Defendant for violations of the FAL, conversion, unjust enrichment, negligent misrepresentation, and fraud.

## PLAINTIFF'S INDIVIDUAL ALLEGATIONS

66.     Plaintiff Holly Winston is an individual consumer who signed up to Defendant's Peacock Plus Subscription in or around May of 2023 while residing in California.  At the time Ms. Winston signed up for her Peacock Subscription, she provided her Payment Method information directly to Defendant.

67.     Before Ms. Winston purchased her Peacock Subscription, Defendant did not disclose to Ms. Winston all of the required automatic renewal offer terms associated with her subscription program.  Additionally, the manner in which this information was presented was insufficient to put Ms. Winston on notice of the material automatic renewal offer terms applicable to her Peacock Subscription.  Specifically, prior to completing her Peacock Subscription order, the relevant screens and buttons presented to Ms. Winston did not clearly and conspicuously state that her Peacock Subscription would automatically renew every month until she canceled; they did not state the recurring charges that would be charged to Ms. Winston's Payment Method as part of the automatic renewal plan, explain that the timing of the charge would change, or disclose the monthly date to which the charge would change; and they did not describe the full cancellation policy that applied to the purchase.

68.     Moreover, at no point prior to completing her initial purchase did Defendant obtain Ms. Winston's affirmative consent to an agreement containing the automatic renewal offer terms.

69.     After Ms. Winston completed her initial order, Defendant sent Ms. Winston an Acknowledgment Email stating that her Peacock Subscription had been activated.  However, that Acknowledgment Email failed to provide Ms. Winston with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Ms. Winston's Peacock Subscription in a manner capable of being retained by her.  Ms. Winston did not receive any other acknowledgments that contain the required information.

70. As a result of Defendant's missing and otherwise deficient disclosures, when Ms. Winston selected and enrolled Peacock Subscription, she was unaware that Defendant enrolled her in an "automatic renewal" program under which the subscription would renew each month and result in continuous monthly automatic renewal charges to her Payment Method unless and until Plaintiff chose to cancel. In any case, shortly after Ms. Winston first signed up for her Peacock Subscription, Ms. Winston learned upon reviewing her billing statements and banking history that, notwithstanding the confusing terms of her Peacock Subscription, Defendant enrolled Ms. Winston into its monthly automatic-renewal subscription and, without Ms. Winston's affirmative consent, charged Ms. Winston Payment Method for the initial $9.99 associated with her Peacock Subscription. After this discovery, Ms. Winston attempted to cancel her Peacock Subscription, but due to Defendant's obfuscated cancelation method, was unable to do so. As such, Ms. Winston called her credit card issuer to reject additional charges from Defendant.  Defendant's misleading, missing and incomplete disclosures and its failure to obtain Ms. Winston's affirmative consent before charging her Payment Method on a monthly basis, are contrary to the ARL, which deems products provided in violation of the statute to be a gift to consumers. *See* Cal. Bus. & Prof. Code § 17603. Had Defendant complied with the ARL, Ms. Winston would have been able to read and review the auto renewal terms prior to purchase, and he would not have subscribed to Peacock Subscription at all or on the same terms. As a direct result of Defendant's violations of the ARL, Ms. Winston suffered an economic injury.

71. The facts giving rise to Ms. Winston's claims are materially the same as the Class she seeks to represent.

## CLASS ACTION ALLEGATIONS

72. Plaintiff brings this action on behalf of herself and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). Specifically, the Class is defined as:

> All persons in California who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, incurred renewal fee(s) in connection with Defendant's offerings for paid Peacock Subscriptions.

73.     Specifically excluded from the Class are Defendant and any entities in which Defendant have a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

74.     Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

75.     ***Numerosity.***  Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, the Class comprises at least millions of consumers throughout California.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

76.     ***Commonality and Predominance***.  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Defendant's Peacock Subscriptions constitute "Automatic renewal[s]" within the meaning of Cal. Bus. & Prof. Code § 17601(a); (b) whether Defendant failed to present the automatic renewal offer terms, or continuous service offer terms, in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled and in visual proximity to the request for consent to the offer, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (c) whether Defendant charged Plaintiff's and Class members' Payment Method for an automatic renewal or continuous service without first obtaining their affirmative consent to the automatic renewal offer terms or continuous service offer terms in violation of Cal. Bus. & Prof. Code § 17602(a)(2); (d) whether Defendant failed to provide an acknowledgment that included the automatic renewal or continuous service offer terms, cancellation policy, and information on how to cancel in a manner that is capable of being retained by Plaintiff and the Class, in violation of Cal. Bus. & Prof. Code § 17602(a)(3); (e) whether the goods and services provided by Defendant are deemed an "unconditional gift" in accordance with Cal. Bus. & Prof. Code § 17603; (f) whether

Defendant's conduct alleged herein violated California's False Advertising Law ("FAL"), Cal. Civ. Code §§ 1750, *et seq.*, and/or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (g) whether Defendant's conduct alleged herein constitutes conversion and/or unjust enrichment; (h) whether Plaintiff and the Class are entitled to damages and/or restitution; (i) whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and (j) whether Plaintiff and the Class are entitled to attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

77.      ***Typicality.***  The claims of Plaintiff Winston are typical of the claims of the Class in that Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to obtain Plaintiff's and the Class's affirmative consent to the automatic renewal offer terms or continuous service offer terms associated with the Peacock Subscriptions before charging their Payment Methods.

78.      ***Adequacy***.  Plaintiff will fairly and adequately protect Class members' interests. Plaintiff has no interests antagonistic to Class members' interests, and Plaintiff has retained counsel that have considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

79.      ***Superiority***.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

80.      Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

81.      Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and will likely retain the benefits of its wrongdoing.

82.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

**COUNT I**
**Violations of California's Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

83.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

84.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

85.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" Cal. Bus. & Prof. Code § 17200.  The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Cal. Bus. & Prof. Code § 17204.  Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

86.     At all relevant times, Defendant has violated, and continues to violate, the UCL's proscription against engaging in unlawful and/or unfair conduct as a result of its violations of the ARL, Cal. Bus. & Prof. Code §§ 17600, *et seq.*  Specifically, Defendant failed, and continues to fail, to: (a) provide the auto-renewal terms associated with its Peacock Subscriptions "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer," in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiff and the Class to those terms before charging their Payment Methods, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (c) provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3).  Defendant also makes it exceedingly difficult and unnecessarily confusing for

consumers to cancel their Peacock Subscriptions, in violation of Cal. Bus. & Prof. Code §
17602(b).

87.     Each of these acts and practices constitutes an independent violation of the ARL,
and thus an independent violation of the UCL.

88.     All products received from Defendant in violation of the ARL, Cal. Bus. Prof.
Code §§ 17602, *et seq.*, constitute "unconditional gifts."  *See* Cal. Bus. Prof. Code § 17603.  As
a direct and proximate result of Defendant's unlawful and/or unfair practices described herein,
Defendant has received, and continues to hold, unlawfully obtained property and money
belonging to Plaintiff and the Class in the form of payments made by Plaintiff and Class
members for their Peacock Subscriptions.  Defendant has profited from its unlawful and/or
unfair acts and practices in the amount of those business expenses and interest accrued thereon.

89.     Defendant's acts and omissions as alleged herein violate obligations imposed by
statute, are substantially injurious to consumers, offend public policy, and are immoral,
unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged
benefits attributable to such conduct.

90.     There were reasonably available alternatives to further Defendant's legitimate
business interests, other than the conduct described herein.

91.     Defendant's acts, omissions, nondisclosures, and misleading statements as
alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

92.     Plaintiff and the members of the Class have suffered a substantial injury in fact
and lost money by virtue of Defendant's acts of unfair competition, which caused them to
purchase the Peacock Subscriptions.  Had Defendant complied with its disclosure obligations
under the ARL, Plaintiff and members of the Class would not have purchased their Peacock
Subscriptions or would have canceled their Peacock Subscriptions prior to the renewal of the
subscriptions, so as not to incur additional fees.  Thus, Plaintiff and members of the Class were
damaged and have suffered economic injuries as a direct and proximate result of Defendant's
unlawful and/or unfair business practices.

93.     Defendant's violations have continuing and adverse effects because Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this unlawful course of conduct.  The public and the Class are subject to ongoing harm because the unlawful and/or unfair business practices associated with the Peacock Subscriptions are still used by Defendant today.

94.     Plaintiff and the Class seek restitution pursuant to Cal. Bus. & Prof. Code § 17203 of all amounts that Defendant charged or caused to be charged to Plaintiff's and the Class's Payment Methods in connection with their Peacock Subscriptions during the four years preceding the filing of this Complaint.  Defendant should be required to disgorge all the profits and gains it has reaped and restore such profits and gains to Plaintiff and the Class, from whom they were unlawfully taken.

95.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and members of the Class seek a court order enjoining Defendant from such future misconduct, and any other such orders that may be necessary to rectify the unlawful business practices of Defendant.

96.     Plaintiff Winston brings this action as private attorney general and to vindicate and enforce an important right affecting the public interest.  Plaintiff and the Class are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

## COUNT II
### Conversion

97.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

98.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

99.     As a result of charges made by Defendant to Plaintiff's and Class members' Payment Methods without authorization and in violation of California law, Defendant has taken money that belongs to Plaintiff and the Class.

100.    The amount of money wrongfully taken by Defendant is capable of identification.

101.    Defendant engaged in this conduct knowingly, willfully, and with oppression, fraud, and/or malice within the meaning of Cal. Civil Code § 3294(c).

102.    As a result of Defendant's actions, Plaintiff and the Class have suffered damages.

### COUNT III
### Violations of California's False Advertising Law ("FAL"),
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

103.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

104.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

105.    California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state,  …in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

106.    Defendant committed acts of false advertising, as defined by § 17500, by intentionally making and disseminating statements to consumers in California and the general public concerning Defendant's products and services, as well as circumstances and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by Defendant to be untrue or misleading.  Defendant has also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

107.    Defendant's statements include but are not limited to representations and omissions made to consumers before and after enrollment in Defendant's Peacock Subscriptions regarding the terms of payment for and cancellation of a consumer's automatic payments. Defendant is silent with regard to the terms of its cancellation policy.  These omissions on the Checkout Page and the Acknowledgment Email constitute false and deceptive advertisements.

108.    Defendant's actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived.

109.    Plaintiff and the members of the Class were deceived by Defendant's statements and omissions made online when they signed up and started paying for their Peacock Subscriptions, and there is a strong probability that other California consumers and members of the public were also or are likely to be deceived as well.  Any reasonable consumer would be misled by Defendant's false and misleading statements and material omissions.  Plaintiff and other members of the Class did not learn of Defendant's cancellation and automatic payment policies until after they had already signed up and started paying for Defendant's Peacock Subscription. As such. they relied on Defendant's statements and omissions to their detriment.

110.    Plaintiff and the Class lost money or property as a result of Defendant's FAL violations because they would not have purchased the Peacock Subscriptions on the same terms if the true facts were known about the product and the Peacock Subscriptions do not have the characteristics as promised by Defendant.

111.    Plaintiff Winston, individually and on behalf of all similarly situated California consumers, seeks individual, representative, and public injunctive relief and any other necessary orders or judgments that will prevent Defendant from continuing with its false and deceptive advertisements and omissions; restitution that will restore the full amount of their money or property; disgorgement of Defendant's relevant profits and proceeds; and an award of costs and reasonable attorneys' fees.

## COUNV IV
### Unjust Enrichment / Restitution

112.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

113.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

114.    Plaintiff and the Class conferred benefits on Defendant by purchasing the Peacock Subscriptions.

115.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the Class's purchases of the Peacock Subscriptions.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant's failure to disclose material terms of the purchase agreement, in violation of California law, induced Plaintiff and the Class to purchase the Peacock Subscriptions.  These omissions caused injuries to Plaintiff and the Class because they would not have purchased the Peacock Subscriptions at all, or on the same terms, if the true facts were known.

116.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and the Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class for their unjust enrichment, as ordered by the Court.

## COUNT V
### Negligent Misrepresentation

117.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

118.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

119.    As discussed above, Defendant omitted, failed to disclose, and intentionally concealed from its advertisements and related statements regarding the Peacock Subscriptions material facts concerning billing, cancellation, and automatic payment terms, policies, and requirements.

120.     At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

121.     At an absolute minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the Peacock Subscriptions and their associated terms.

122.     The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase and enroll in Defendant's Peacock Subscription programs.

123.     Plaintiff and Class members would not have purchased the Peacock Subscriptions if the true facts had been known.

124.     The negligent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VI
### Fraud

125.     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

126.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

127.     As discussed above, Defendant provided Plaintiff and Class members with false or misleading material information and failed to disclose material facts about the Peacock Subscriptions and their associated automatic renewal terms, including terms regarding Defendant's cancellation policy and billing practices and policies.  These misrepresentations and omissions were made by Defendant with knowledge of their falsehood.

128.     The misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Peacock Subscriptions.

129. The fraudulent actions of Defendant caused damage to Plaintiff and the members of the Class, who are entitled to damages and other legal and equitable relief as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Winston, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the Class and naming Plaintiff as a representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b. For an order declaring Defendant's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d. For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief;

g. For injunctive relief as pleaded or as the Court may deem proper; and

h. For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: September 15, 2023                    Respectfully submitted,

**GUCOVSCHI ROZENSHTEYN, PLLC**

By: /s/ Adrian Gucovschi
    Adrian Gucovschi, Esq.

Adrian Gucovschi
630 Fifth Avenue, Suite 2000
New York, NY 10111
Tel: (212) 884-4230
adrian@gr-firm.com

**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III
888 Seventh Avenue
New York, NY  10019
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: fklorczyk@bursor.com

*Attorneys for Plaintiff and the Putative Class*